UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------- X
DAVID CORBETT, JR.,

              Plaintiff,                **MEMORANDUM & ORDER**

   -against-                  10-CV-3908 (KAM)

JANET NAPOLITANO, in her official
capacity as Secretary of the
United States Department of
Homeland Security,

              Defendant.
--------------------------------- X

**MATSUMOTO, United States District Judge:**

        Plaintiff David Corbett, Jr. ("plaintiff") brings this action alleging employment discrimination based on race and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Specifically, plaintiff claims that he was discriminated and retaliated against when his employment with the U.S. Customs and Border Patrol ("CBP") was terminated, and that his former supervisors at the Federal Air Marshal Service ("FAMS") retaliated against him for opposing unlawful employment practices by providing negative references to CBP during CBP's background investigation of plaintiff. Both CBP and FAMS are federal law enforcement agencies organized under the defendant Department of Homeland Security ("DHS" or "defendant").

        Defendant has several motions before the court. First, defendant moves for summary judgment, pursuant to Federal Rule

of Civil Procedure 56, on the limited issue of whether plaintiff exhausted his retaliation claim against his former supervisors at FAMS.  Second, defendant moves to dismiss plaintiff's retaliation claim involving FAMS for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Third, defendant moves to dismiss plaintiff's retaliation and discrimination claims involving CBP for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  Finally, plaintiff moves to amend his complaint for a fourth time to add claims against individual defendants for violations of his right to equal protection of the law under the Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  Defendant objects to plaintiff's motion to amend on the grounds that plaintiff's proposed amendment is futile and that his *Bivens* claims are time-barred.  Having reviewed the parties' submissions, the record before the court, and the relevant case law, for the reasons set forth below, the court denies defendant's motions to dismiss and for summary judgment and denies plaintiff's motion to amend his complaint for the fourth time.

## BACKGROUND

**I.   Statement of Facts**

The following facts are taken from plaintiff's Third Amended Complaint and are assumed to be true for the purposes of defendant's Rule 12(b)(6) motion to dismiss.

    **A.   Plaintiff's Employment at the Immigration and Naturalization Service**

Plaintiff, an African American and Native American military veteran, was employed as an immigration inspector with the Immigration and Naturalization Service ("INS"), then a part of the Department of Justice, from April 1998 to April 2002. (ECF No. 43, Third Amended Complaint ("Compl.") ¶¶ 7, 11 & n.1.) As a condition of his employment with INS, plaintiff successfully underwent a sensitive security background investigation and received a "Secret" level security clearance. (*Id.* ¶ 12.)  During his employment at INS, plaintiff received annual performance ratings of either "Excellent" or "Outstanding," the highest possible ratings.  (*Id.* ¶ 13.)

    **B.   Plaintiff's Employment at the Federal Air Marshal Service ("FAMS")**

In early 2002, plaintiff was granted a transfer to the New York Field Office of FAMS. (*Id.* ¶¶ 14, 17.)  Due to plaintiff's experience in the military and with INS, plaintiff qualified for a non-probationary, permanent career status position at FAMS with veteran's preference status.  (*Id.* ¶ 14.)

Additionally, plaintiff qualified for a supervisory position at FAMS based on his experience and testing scores. (*Id.*) After plaintiff resigned from INS, however, FAMS informed him that he would only be offered a probationary, non-supervisory position without permanent career or veteran's preference status, even though plaintiff asserts that newly hired Caucasian air marshals in the FAMS New York Field Office were given non-probationary positions and veteran's preference for their military service. (*Id.* ¶¶ 15, 20.)

In April 2002, Plaintiff began his employment at FAMS, where he was required to complete a twelve-month probationary period after receiving a "Top Secret" security clearance. (*Id.* ¶¶ 15, 17.) Although he completed a timely application for a "Top Secret" security clearance, plaintiff's application remained pending during the entire course of his employment at FAMS, while FAMS granted security clearances to white air marshals in a timely manner. (*Id.* ¶¶ 16, 21.) Additionally, the United States Office of Personnel Management completed its background check in connection with plaintiff's security clearance application and sent the results to FAMS on or about May 22, 2003, but plaintiff was never notified of the results of the investigation. (*Id.* ¶ 35.)

Under FAMS policy, air marshals were required to arrive at the airport two hours before their scheduled flight.

(*Id.* ¶ 22.)  Plaintiff, however, asserts that the policy was loosely enforced at the FAMS New York Field Office, and that air marshals regularly arrived late without repercussions.  (*Id.*)  Plaintiff also maintains that the atmosphere at the FAMS New York Field Office was "permeated by racial hostility."  (*Id.* ¶ 18.)  Specifically, he asserts that white air marshals were regularly late for flights, missed flights, had altercations with airline staff, and drank alcoholic beverages on duty, all in breach of FAMS policy, but did not receive adverse employment actions as a result of their conduct.  (*Id.* ¶¶ 18, 23.)

On April 3, 2003, plaintiff carried his fiancée's luggage with him through a security checkpoint at the Dallas/Forth Worth Airport (the "Dallas Incident"), which was an alleged breach of airport security procedures.  (*Id.* ¶ 27.)

On May 12, 2003, plaintiff met with (1) Ira Shinske ("Shinske"), Assistant Special Agent in Charge of the New York Field Office and plaintiff's immediate supervisor, (2) Geraldo Spero ("Spero"), Deputy Special Agent in Charge of the New York Field Office, and (3) Felix Jiminez ("Jiminez"), Special Agent in Charge of the New York Field Office.  (*Id.* ¶¶ 24, 29-30.)  The Special Agents informed plaintiff that he was being investigated by the Transportation Security Administration ("TSA") Office of Internal Affairs and Program Review ("OIAPR") because of the Dallas Incident.  (*Id.* ¶ 30.)  At the same

meeting, plaintiff complained that he was being singled out for unduly harsh treatment because of his race and that white air marshals were not being punished for arriving late for work or for security breaches. (*Id.* ¶ 31)  According to plaintiff, Spero replied that plaintiff had "no future" with the FAMS and that he should resign before he "ruin[ed] [his] federal career." (*Id.*)  When plaintiff refused to resign, Spero allegedly told plaintiff that he would be fired and that a termination letter would arrive from FAMS headquarters "any day now."  (*Id.*) Plaintiff was subsequently interviewed by the OIAPR regarding the Dallas Incident.  (*Id.* ¶ 32.)

On May 22, 2003, at plaintiff's request, plaintiff met with Jiminez and Spero to discuss the May 12, 2003 meeting.  (*Id.* ¶ 34.)  Jiminez reiterated that plaintiff would be fired and allegedly refused to listen to plaintiff's explanation of the Dallas Incident or read an affidavit plaintiff had provided to OIAPR.  (*Id.*)  Although Jiminez told plaintiff he would have the opportunity to rebut the charges against him, no opportunity was provided.  (*Id.*)

Between May 22, 2003 and August 14, 2003, no one at FAMS discussed any alleged performance issues with plaintiff, and plaintiff began to receive less desirable assignments after the May 12, 2003 meeting.  (*Id.* ¶¶ 37-38.)  On August 14, 2003, plaintiff was terminated from probationary employment with FAMS.

(*Id.* ¶¶ 39-40.)   Plaintiff's termination letter from Spero and Jiminez explained that he was fired due to tardiness, failing to report tardiness on his attendance records, and for the alleged breach of security in connection with the Dallas Incident.   (*Id.* ¶ 39.)

**C.    Plaintiff's Employment at the U.S. Customs and Border Protection ("CBP")**

In May 2007, plaintiff accepted a position as an officer with CBP, contingent on his clearing a background investigation and receiving a "Top Secret" security clearance. (*Id.* ¶ 41.)

As part of the background investigation, the CBP investigator interviewed Jiminez and Shinske, who both stated that they "would not recommend [plaintiff] for a position of trust with the federal government."   (*Id.* ¶¶ 46-47.)   Jiminez also told the CBP investigator that he authorized plaintiff's termination from FAMS after reviewing the results of an investigation into plaintiff's "work habits and behavior" (*id.* ¶ 46), and Shinske told the investigator that plaintiff was repeatedly late for work and that he was involved in a security violation with his ex-fiancé, presumably a reference to the Dallas Incident (*id.* ¶ 47).

On October 4, 2007, plaintiff received a Notice of Proposed Action ("NOPA") finding him "unsuitable for employment"

with the CBP because his background investigation revealed
"potentially derogatory information" concerning "Dishonest
Conduct/Misconduct or Negligence in Employment." (*Id.* ¶ 42; ECF
No. 60-2, NOPA (submitted by plaintiff) at 1.)  The NOPA also
mentioned that information from the background investigation
"may be furnished to designated officers and employees of
agencies and departments of the Federal Government for
employment purposes, to include a security clearance
determination." (NOPA at 2-3.)

Moreover, the NOPA contained the findings of
plaintiff's background investigation, which revealed that
although plaintiff claimed he had only been terminated by one
employer (FAMS), he had previously been terminated from
positions at the U.S. Postal Service and Social Security
Administration and asked to resign from a position at Monroe
College. (*Id.* at 1-2.)  Further, the background investigation
revealed that sources from FAMS stated that plaintiff was
terminated from FAMS "after conducting an investigation on [his]
work habits and behavior that involved a security violation and
tardiness," specifically that plaintiff was tardy twenty-two
times in a fourteen-month period. (*Id.* at 2.)  Finally, the
investigation revealed that plaintiff was disqualified for a
Good Conduct Medal during his military service because of
"unfavorable actions" and eighteen unexcused absences from

training.  (*Id.*)  The NOPA informed plaintiff that he could

respond to the issues raised by his background investigation,

and plaintiff alleges that he submitted a timely response.  (*Id.*

at 1; Compl. ¶ 43.)

On October 17, 2007, the CBP background investigator

recommended that plaintiff be granted a "Top Secret" security

clearance, with a formal warning letter in his file.  (Compl.

¶ 48.)  On October 22, 2007, CBP officials recommended that

plaintiff be denied a security clearance, citing an alleged

"pattern of employment issues."  (*Id.* ¶ 49.)  On October 31,

2007, Joyce Wood, Director of CBP's Personnel Security Division,

determined that plaintiff failed to pass his background check.

(*Id.* ¶ 50.)

On December 17, 2007, plaintiff received a termination

letter from Susan Mitchell, the New York Operations Director for

CBP.  (*Id.* ¶ 11.)  The termination letter stated:

> You were appointed to the position of CBP Officer with
> the understanding that you would be required to
> satisfactorily complete your background investigation.
> Your background investigation has revealed significant
> derogatory information.  Subsequently, it has been
> determined that you have failed to meet the standards
> required to clear your background investigation.
> Therefore, I have no choice but to terminate your
> employment with CBP due to your failure to meet a
> condition of employment."

(*See* ECF No. 60-3, Letter from Susan Mitchell dated December 13,

2007 ("Mitchell Termination Letter").)  Subsequently, at a

December 21, 2007 meeting, Mitchell told plaintiff that "she would have no problem with Corbett's continued employment with CBP if he had he passed his background check."[1]   (Compl. ¶ 52.) Mitchell said she made her decision to terminate plaintiff based on Wood's recommendation, and had not read any of the documents plaintiff submitted in response to the NOPA.   (*Id.*)

D.  **Plaintiff's Merit Systems Protection Board and Equal Employment Opportunity Commission Complaints**[2]

Shortly after leaving FAMS, plaintiff challenged his FAMS termination through the Merit Systems Protection Board ("MSPB") on due process and procedural grounds.   (ECF No. 57, Defendant's Statement of Undisputed Material Facts Pursuant to Local Civil R. 56.1 ("Def. 56.1 Stmt.") ¶ 8.)   In the MSPB challenge, plaintiff did not allege that discrimination or

---

[1] In plaintiff's declaration dated May 16, 2008 (the "EEOC Declaration"), which was made under penalty of perjury pursuant to 28 U.S.C. § 1746 and submitted in support of his complaint of discrimination to the Equal Employment Opportunity Commission, plaintiff stated that Mitchell told him that "if my *security clearance* were granted she would not have a problem with me continuing employment as a CBP officer in her district."  (ECF No. 60-6, EEOC Declaration ("EEOC Decl.") at 4 (emphasis added).)   Subsequently, however, plaintiff appears to have amended that statement in the Third Amended Complaint by alleging that Mitchell told him instead that "she would have no problem with [his] continued employment with CBP if he had passed his *background check*."  (Compl. ¶ 52 (emphasis added).)

[2] This section of facts is relevant to defendant's motion for summary judgment on plaintiff's failure to exhaust his retaliation claim against his former supervisors at FAMS.   Accordingly, the following facts, which are taken from the parties' statements of undisputed material facts pursuant to Local Civil Rule 56.1, are undisputed unless otherwise indicated. The court has considered whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in the light most favorable to the nonmoving plaintiff.   *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001).

retaliation played a role in his termination from FAMS.[3]   (*Id.*
¶ 9.)   The MSPB sustained plaintiff's removal on December 17,
2003.   *See Corbett v. Dep't of Homeland Sec.*, No. NY-0752-03-
0363-B-1, 2004 MSPB LEXIS 2550 (M.S.P.B. Nov. 19, 2004).

On January 31, 2008, after his termination from CBP,
plaintiff filed a formal complaint with the Equal Employment
Opportunity Commission ("EEOC") alleging that he was terminated
from employment with CBP as the result of race and color
discrimination and retaliation (the "EEOC Complaint").   (Def.
56.1 Stmt. ¶¶ 16-17; *see* ECF No. 60-1, EEOC Complaint ("EEOC
Compl.") at 1-2.)   Specifically, plaintiff checked boxes on the
EEOC Complaint labeled "race," "color," and "retaliation" to
indicate the bases of his discrimination.   (EEOC Compl. at 2.)

In the EEOC Complaint, plaintiff identified "U.S. CBP
Personnel Security Division" as the "DHS component who took the
action at issue."   (*Id.*)   Plaintiff also stated in the EEOC
Complaint that the retaliation against him occurred on or after
August 13, 2003, the approximate date of his termination from
FAMS and several years before the beginning of his employment

---

[3] Plaintiff's attorney at the time advised plaintiff not to raise
discrimination or retaliation claims in his challenge to his FAMS termination
before the MSPB.   (ECF No. 64, Plaintiff's Opposition to Defendant's
Statement of Undisputed Facts and Statement of Material Facts Pursuant to
Local Civil Rule 56.1 ("Pl. 56.1 Stmt.") ¶ 9.)

with CBP.  (*Id.*; Pl. 56.1 Stmt. ¶ 29.)[4]  Additionally, in

Attachment A to the EEOC Complaint, plaintiff wrote:

> [T]here was discrimination based on race and
> color that I experienced with the Federal Air
> Marshal Service involving circumstances dealing
> with my termination from them, which seems to
> have been used against me to warrant
> justification in the termination of employment
> with CBP.
>
> [. . .]
>
> I am being discriminated against based on what
> were unfair and questionable actions taken
> against me while employed as a Federal Air
> Marshal, as well as unsubstantiated allegations,
> misunderstandings, and hearsay raised about my
> previous employment.

(EEOC Compl., Attachment A at 2.)

During the administrative proceedings regarding the

EEOC Complaint, plaintiff stated that he did not recall if he

ever complained about discriminatory treatment based on race

while at FAMS, nor did plaintiff specifically allege in the EEOC

proceeding that he complained about disparate treatment or

discrimination during a meeting with FAMS supervisors.  (Def.

56.1 Stmt. ¶¶ 21-22 (citing ECF No. 60-4, Transcript of David

Corbett Deposition dated Sept. 16, 2008 ("Corbett Dep. Tr.") at

---

[4]  Although the EEOC Complaint prompts the complainant to provide
the dates of "Prior EEO Activity" in the space that plaintiff wrote "on or
after Aug[ust] 13[,] 2003," it is uncertain whether plaintiff understood
"Prior EEO Activity" to refer to prior protected activity or to the alleged
retaliation.  (*See* EEOC Compl. at 2.)  Accordingly, because all reasonable
inferences and ambiguities must be resolved against the defendant for the
purposes of deciding its summary judgment motion, *Flanigan*, 242 F.3d at 83,
the court must accept as true plaintiff's statement that this date range
referred to the time period during which the retaliation occurred.

88).)[5]   When asked for the names of potential witnesses,
plaintiff stated, "FAM[S] personnel can of course speak more
about the retaliatory aspects of this case."   (Pl. 56.1 Stmt.
¶ 32 (quoting EEOC Decl. at 11).)   Plaintiff also told EEOC
officials that the CBP officials who terminated him "seemed to
take into consideration unsubstantiated allegations, unconfirmed
reports and derogatory opinions given by people still employed
with the FAM[S] Service."   (*Id.* ¶ 33 (quoting EEOC Decl. at
13).)

          In an investigative summary, a DHS official noted that
during the EEOC investigation, plaintiff "contend[ed] he was
subjected to the adverse findings in his background
investigation because of his previous termination from the U.S.
Federal Air Marshals Service, which discriminated against him
based on his race and color."   (*Id.* ¶ 31 (quoting ECF No. 60-5,
Investigative Summary at 4).)   An Administrative Law Judge
dismissed the EEOC Complaint on October 30, 2008 (Def. 56.1 Stmt.
¶ 24; *see* ECF No. 56, Seth D. Eichenholtz Declaration

---

[5] Plaintiff adds that when he was asked by the EEOC about what was
discriminatory in the CBP background investigation, plaintiff stated, "[f]rom
what I[] understand I think it leans much more toward retaliation . . . [f]or
what occurred at the Federal Air Marshal Service."   (Pl. 56.1 Stmt. ¶ 22
(quoting Corbett Dep. Tr. at 87).)   Defendant objects to plaintiff's
additional statement, contending that the context of his statement suggested
plaintiff was "concerned that CBP was considering plaintiff's termination by
FAMS 'without having all the information,' not that FAMS employees retaliated
against plaintiff for engaging in protected activity."   (ECF No. 65,
Defendant's Reply Statement of Undisputed Material Facts Pursuant to Local
Civil R. 56.1 ("Def. Reply 56.1 Stmt.") ¶ 22 (quoting Corbett Dep. Tr. at 87-
88).)

("Eichenholtz Decl."), Ex. D (the "EEOC Decision") at 7), and the decision was affirmed on appeal on December 10, 2009 (*see* Eichenholtz Decl., Ex. F (the "EEOC Appeal Decision") at 1).

### E.   The Instant Action

Plaintiff filed his original *pro se* complaint in the present action on August 23, 2010 (*see* ECF No. 1, Original Complaint), his *pro se* First Amended Complaint on December 20, 2010 (*see* ECF No. 33, First Amended Complaint), and his *pro se* Second Amended complaint on March 1, 2011 (*see* ECF No. 37, Second Amended Complaint).  After plaintiff obtained counsel to represent him in this action, plaintiff filed the Third Amended Complaint on May 23, 2011.

On November 28, 2011, defendant filed the instant motions and an opposition to plaintiff's motion to amend (*see* ECF No. 61, Memorandum of Law in Support of Defendant's Motion to Dismiss the Third Amended Complaint and in Opposition to Plaintiff's Motion to Amend His Complaint ("Def. Mem.")), plaintiff filed his motion to amend and an opposition to defendant's motions (*see* ECF No. 62, Memorandum of Law in Support of Plaintiff's Motion to Amend the Complaint and in Opposition to Defendant's Motion to Dismiss the Complaint ("Pl. Opp'n")), and the defendant filed a reply brief (*see* ECF No. 63, Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss the Third Amended Complaint ("Def. Reply")).

## DISCUSSION

**II.   Defendant's Summary Judgment Motion on the Issue of Exhaustion of Plaintiff's Retaliation Claim against FAMS**

Defendant moves for summary judgment on the limited issue of whether plaintiff exhausted his claim of retaliation by former supervisors at FAMS.  Defendant argues that, in plaintiff's January 2008 EEOC Complaint, plaintiff failed to exhaust his retaliation claim alleging that FAMS officials provided negative references to CBP in retaliation for plaintiff's May 2003 informal complaint of discrimination.  (Def. Mem. at 18.)  Specifically, defendant asserts that plaintiff did not allege in the EEOC Complaint that FAMS officials took retaliatory action because (1) plaintiff only listed "U.S. CBP Personnel Security Division" as the "DHS component who took the action at issue" (Def. Mem. at 18; *see* EEOC Compl. at 2), and (2) plaintiff did not allege that he engaged in any protected activity while at FAMS in the EEOC Complaint (Def. Mem. at 19).

Plaintiff maintains that he exhausted his retaliation claim and put the EEOC and the DHS on notice of his claims involving FAMS officials' retaliatory acts when he checked a box for retaliation in the EEOC Complaint and alleged that events that occurred during his employment at FAMS were used against him when he was terminated from CBP.  (Pl. Opp'n at 19-20.)

**A.   Legal Standard for Summary Judgment**

A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (internal quotation marks omitted).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted). Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On a motion for summary

judgment, the court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan*, 242 F.3d at 83.

**B.    Legal Standard for Exhaustion**

It is well-settled that prior to bringing suit under Title VII, "a federal government employee must timely 'exhaust the administrative remedies at his disposal.'" *Belgrave v. Pena*, 254 F.3d 384, 386 (2d Cir. 2001) (per curiam).  In order to exhaust administrative remedies for a Title VII claim, a plaintiff must raise the claim in a written EEOC complaint in compliance with regulations promulgated by the EEOC.  *Id.*

Claims not raised in an EEOC complaint, however, may still be brought in federal court if they are "reasonably related" to the claims asserted in the EEOC complaint. *Mathirampuzha v. Potter*, 548 F.3d 70, 76-77 (2d Cir. 2008).  A claim not alleged in an EEOC complaint is considered "reasonably related" if "'the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'"  *Id.* at 76.  In determining whether claims are "reasonably related," courts conduct a "fact-intensive analysis" with the focus on "the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving."

*Id.* (internal quotation marks omitted).  "'The central question is whether the complaint filed with the [EEOC] gave th[e] agency adequate notice to investigate discrimination on both bases.'" *Id.* at 77 (quoting *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006)).

"This 'reasonably related' exception to exhaustion is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering." *Williams*, 458 F.3d at 70 (internal quotation marks omitted).  Furthermore, the Supreme Court has held that "[d]ocuments filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 406 (2008).

With respect to retaliation claims, courts in this Circuit have found that even if a plaintiff did not allege that he engaged in a specific type of protected activity in his EEOC complaint, a retaliation claim is still exhausted if the plaintiff checked the retaliation box and described the retaliatory action taken against him in his EEOC complaint. *See Wilson v. N.Y.C. Police Dep't*, No. 09 Civ. 2632, 2011 U.S. Dist.

LEXIS 38995, at *29-31 (S.D.N.Y. Feb. 4, 2011) (Report and
Recommendation) (finding that plaintiff exhausted her
retaliation claim when she checked the retaliation box in her
EEOC complaint and alleged she was transferred after reporting
"unspecified offensive material"), *adopted by* 2011 U.S. Dist.
LEXIS 31317 (S.D.N.Y., Mar. 25, 2011); *Morrow v. Metro. Transit
Auth.*, No. 08 CIV. 6123, 2009 U.S. Dist. LEXIS 39252, at *5-6,
*20-22 (S.D.N.Y. May 8, 2009) (finding that plaintiff "properly
exhausted" his retaliation claim where he checked the
retaliation box in his EEOC complaint and specified the relevant
dates, even though the plaintiff failed to identify any
protected activity to support his claim of retaliation); *see
also Cooper v. Xerox Corp.*, 994 F. Supp. 429, 436 (W.D.N.Y.
1998) ("[I]t is well-settled that merely checking a box, or
failing to check a box does not necessarily control the scope of
the charge.  The more critical analysis is whether there is any
explanation or description supporting a particular claim.").

        Additionally, a claim is deemed "reasonably related"
to an EEOC complaint if the claim fell within the actual scope
of the EEOC investigation arising from the complaint, as
indicated in the EEOC decision.  *Dixit v. N.Y.C. Dept. of Gen.
Serv.*, 972 F. Supp. 730, 733-34 (S.D.N.Y. 1997) (finding that
national origin and religious discrimination claims were
reasonably related to a retaliation claim where the EEOC

decision specifically addressed all three categories of discrimination).

### C.   The Sufficiency of Plaintiff's Exhaustion of Administrative Remedies

Here, although plaintiff listed CBP as the "DHS component who took the action at issue" (EEOC Compl. at 2), the EEOC Complaint alleged enough facts regarding his retaliation claim involving FAMS supervisors' negative references for the claim to "fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Mathirampuzha*, 548 F.3d at 76.  First, by marking a box labeled "Retaliation/Reprisal" on the EEOC Complaint (*see* EEOC Compl. at 2), plaintiff notified the EEOC that he was claiming retaliation as one of the bases of the discrimination against him by DHS officials.  Additionally, plaintiff stated in the EEOC Complaint that that the retaliation against him occurred on or after August 13, 2003 (*id.*; Pl. 56.1 Stmt. ¶ 29) - several years before the beginning of his employment with CBP, which strongly indicates that he was referencing retaliation by FAMS officials, not CBP officials.

Second, plaintiff discussed the negative references given by FAMS officials when he stated the following in the EEOC Complaint:  (1) "there was discrimination based on race and color that I experienced with the Federal Air Marshal Service

involving circumstances dealing with my termination from them, which seems to have been used against me to warrant justification in the termination of employment with CBP"; and (2) "I am being discriminated against based on what were unfair and questionable actions taken against me while employed as a Federal Air Marshal, as well as unsubstantiated allegations, misunderstandings, and hearsay raised about my previous employment."  (EEOC Compl., Attachment A at 2.)

Additionally, in his declaration submitted in support of his complaint of discrimination to the EEOC, plaintiff stated that the CBP officials involved in his termination decision "seemed to take into consideration unsubstantiated allegations, unconfirmed reports, and derogatory opinions given by people still employed with the [FAMS]."  (EEOC Decl. at 13.)  Indeed, plaintiff specifically referred in his declaration to "derogatory information" given to CBP by Mr. Jimenez and and Mr. Shinske of the FAMS (*id.* at 4), the same two individuals to whom plaintiff complained of racial discrimination in May 2003 while at the FAMS (Compl. ¶ 31).  An investigation into the "derogatory opinions" regarding plaintiff given by FAMS officials to CBP and the "circumstances dealing with [plaintiff's] termination" from FAMS, which constitute plaintiff's retaliation claim against FAMS, could reasonably be expected to fall within the scope of the EEOC investigation

based on the allegations in the EEOC Complaint.  Indeed, the DHS official investigating plaintiff's EEOC claim noted that plaintiff asserted that he "was subjected to the adverse findings in his [CBP] background investigation because of his previous termination from [FAMS], which discriminated against him based on his race and color."  (Pl. 56.1 Stmt. ¶ 31 (quoting Investigative Summary at 4).)

Third, although plaintiff did not allege he engaged in any protected activity in his EEOC complaint or succeed in showing he engaged in protected activity in the EEOC proceeding (*see* EEOC Decision at 7), such failures do not necessarily preclude a finding of exhaustion.  *See Wilson*, 2011 U.S. Dist. LEXIS 38995, at *29-31; *Morrow*, 2009 U.S. Dist. LEXIS 39252, at *5-6, *20-22.

Finally, the EEOC Decision dismissing plaintiff's complaint specifically discussed plaintiff's claims of retaliation and summarized the results of the investigation into plaintiff's potential protected activity during and before his employment at CBP and at his previous employers, including FAMS. (*See* EEOC Decision at 7.)  The court thus finds that the scope of the EEOC investigation arising from plaintiff's allegations in the EEOC Complaint encompasses his prior protected activity at FAMS and any retaliatory acts arising therefrom.  *See Dixit,* 972 F. Supp. at 733-34.

22

Unlike cases "where the failure to check the box marked 'retaliation' in one's EEOC charge was accompanied by a 'failure to even hint that retaliatory treatment was involved,'" *Reyes v. City College of the City Univ. of N.Y.*, No. 03 CIV. 3132, 2005 U.S. Dist. LEXIS 26953, at *12 (S.D.N.Y. Nov. 4, 2005), here plaintiff both checked the retaliation box and clearly put the DHS and EEOC on notice of discriminatory treatment at FAMS and of negative references regarding plaintiff by FAMS officials to CBP, which is the retaliatory act plaintiff now alleges against FAMS in this action. Accordingly, the court finds that plaintiff administratively exhausted his retaliation claim regarding the negative references given by his FAMS supervisors to CBP and denies defendant's motion for summary judgment on this issue.

## III. Defendant's Motion to Dismiss Plaintiff's Retaliation Claim Against FAMS for Failure to State a Claim

Defendant moves to dismiss plaintiff's retaliation claim involving FAMS for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A. Legal Standard for Rule 12(b)(6) Motion to Dismiss

Rule 12(b)(6) provides for the dismissal of a cause of action if plaintiff's complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In

order to survive a motion to dismiss, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 570 (2007)).  To determine whether a complaint
states a plausible claim for relief, the Supreme Court has
suggested a "'two-pronged approach.'"  *Hayden v. Paterson*, 594
F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).
First, a court should begin "by identifying pleadings that,
because they are no more than conclusions, are not entitled to
the assumption of truth."  *Iqbal*, 556 U.S. at 679 ("While legal
conclusions can provide the framework of a complaint, they must
be supported by factual allegations.").  Second, "[w]hen there
are well-pleaded factual allegations, a court should assume
their veracity and then determine whether they plausibly give
rise to an entitlement to relief."  *Id.*

          The plausibility determination is "a context-specific
task that requires the reviewing court to draw on its judicial
experience and common sense."  *Id.* at 679.  A claim is plausible
"when the plaintiff pleads factual content that allows the court
to draw the reasonable inference that the defendant is liable
for the misconduct alleged."  *Id.* at 678.  The plausibility
standard, however, "is not akin to a 'probability requirement,'

but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

A well-pleaded complaint may survive a motion to dismiss even where "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted). This is because the court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

In conducting such an assessment on a Rule 12(b)(6) motion to dismiss, courts must "'accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party.'" *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010). Furthermore, in resolving a Rule 12(b)(6) motion to dismiss, courts may properly consider documents that are deemed included in, incorporated in, or integral to the complaint. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (noting that a court deciding a Rule 12(b)(6) motion may consider all documents included in the complaint whether by attachment, through incorporation by reference, or because the documents are integral to the pleading). Indeed, courts may consider "the

full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit." *Holmes v. Air Line Pilots Ass'n*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010).

**B.   Legal Standard for Retaliation**

In order to establish a *prima facie* retaliation claim under Title VII, an employee must show "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (internal quotation marks omitted).

In order to survive a Rule 12(b)(6) motion, a plaintiff need not plead facts "sufficient to make a prima facie case" of retaliation or satisfy the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).[6]  *Novak*, 2011 U.S. Dist. LEXIS 120880, at *8 (citing *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  Instead, a plaintiff's complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (internal quotation marks omitted); *see Novak*, 2011 U.S. Dist. LEXIS 120880, at *8.  Notably, courts in this Circuit have noted that in evaluating a Rule 12(b)(6) motion, the court should still consider the elements of a *prima facie* case of retaliation in making a determination of whether a plaintiff's complaint gives a defendant fair notice of the grounds of his claim.  *See, e.g., Son v. Reina Bijoux, Inc.*, 823 F. Supp. 2d 238, 241 (S.D.N.Y. 2011); *Doner-Hendrick v. N.Y. Inst. of Tech.*, No. 11 Civ. 121, 2011 U.S. Dist. LEXIS 72714, at *8 (S.D.N.Y. Jul. 5, 2011) (discussing the motion to dismiss standard in the Title VII retaliation context).

---

[6] In the retaliation context, the familiar *McDonnell Douglas* burden-shifting framework consists of the following three steps:  "First, the plaintiff must establish a *prima facie* case [described above]. . . .  If a plaintiff sustains the initial burden, a presumption of retaliation arises. In turn, under the second step of the burden-shifting analysis, the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  Finally, as for the third step, once an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action.  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

**C.   Whether Plaintiff States a Retaliation Claim Against FAMS**

Defendant argues that plaintiff's retaliation claim regarding FAMS officials' submission of negative references to CBP should be dismissed because (1) plaintiff has not alleged sufficient facts to establish a materially adverse employment action (Def. Mem. at 16-17), and (2) plaintiff has not alleged sufficient facts to establish a causal connection between plaintiff's informal complaint of discrimination and the negative references, which is the alleged act of retaliation (Def. Reply at 8).  Both of these arguments will be addressed in turn.[7]

**1.   Materially Adverse Employment Action**

The submission of negative references regarding plaintiff to background investigators at CBP qualifies as adverse employment actions.  In order to constitute an adverse employment action, an employer's act must rise to the threshold where it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 868 (2011).

---

[7]   Defendant does not contest that plaintiff has properly alleged the first two elements of a *prima facie* case of retaliation:  (1) that plaintiff was engaged in an activity protected under Title VII, namely the informal complaint of discrimination that plaintiff made to his FAMS supervisors during the May 12, 2003 meeting (Compl. ¶ 31); and (2) that plaintiff's employer, through his FAMS supervisors, was aware of plaintiff's participation in the protected activity.

Under Second Circuit precedent, a former employer's refusal to give positive references or circulation of negative references to a plaintiff's potential future employer qualify as adverse employment actions disadvantaging the plaintiff. *See Jute*, 420 F.3d at 178-79 (recognizing that a former's employer's negative job reference containing a false statement may constitute an adverse employment action because it may negatively affect an employee's chances of securing employment, and finding that the district court erred by requiring plaintiff to prove that the potential future employer attributed its non-hire decision to the negative reference); *Pantchenko v. C.B. Dolge Company, Inc.*, 581 F.2d 1052, 1055 (2d Cir. 1978) (per curium) (finding that a former employer's refusal to provide references in retaliation for an employee's prior protected activity could constitute an adverse employment action under Title VII, without requiring the plaintiff to allege that the former employer's refusal actually resulted in her failure to be hired by the potential future employer); *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y. 2006) (noting that "giving negative references . . . in retaliation for a protected activity has also been considered retaliation in violation of Title VII," but dismissing plaintiff's claim on other grounds); *Lake v. Concord Family Services*, No. 96 CV 511, 2000 U.S. Dist. LEXIS 3126, at *13 (E.D.N.Y. Feb. 16, 2000) (finding that former

employer's submission of damaging letters to plaintiff's potential future employers qualified as an adverse employment action, but dismissing plaintiff's retaliation claim on other grounds); *see also* EEOC Compliance Manual § 8-II(D)(2) (May 20, 1998) ("Examples of post-employment retaliation include actions that are designed to interfere with the individual's prospects for employment, such as giving an unjustified negative job reference, [or] refusing to provide a job reference . . . .").

Additionally, a plaintiff need not be employed by the defendant at the time of the alleged adverse employment action, as long as the adverse employment action was "related to or arising out of" an employment relationship. *Pantchenko*, 581 F.2d at 1055 (holding that Title VII "prohibits discrimination related to or arising out of an employment relationship, whether or not the person discriminated against is an employee at the time of the discriminatory conduct").

In his complaint, plaintiff alleged that (1) Jiminez, plaintiff's former supervisor at FAMS, told a CBP background investigator that he "would not recommend Corbett for a position of trust with the federal government," and (2) Shinske, another former FAMS supervisor, told the CBP background investigator that plaintiff "was repeatedly late for work," "was involved in a security violation with his ex-fiancé [sic]," and that "he [Shinske] would not recommend Corbett for a position of trust

with the federal government." (Compl. ¶¶ 46-47.) Additionally, the NOPA referenced in the complaint informed plaintiff that a "source" from FAMS reported to the CBP background investigator that plaintiff had engaged in "a security violation and tardiness" while at FAMS. (*Id.* ¶ 42; NOPA at 2.) Therefore, under Second Circuit precedent, the FAMS officials' alleged circulation of negative references to CBP – plaintiff's potential future employer – qualifies as an adverse employment action for the purposes of a Title VII retaliation claim.

> **2. Causal Connection Between Protected Activity and Retaliation**

The court next considers whether plaintiff has alleged sufficient facts to establish a plausible causal connection between his alleged protected activity and the negative references given by his FAMS supervisors. Defendant argues that plaintiff's claim must be dismissed because (1) plaintiff has failed to allege direct evidence of retaliatory animus; and (2) the three-year gap between the alleged retaliatory act and the protected activity on which it is predicated is too lengthy to establish an indirect inference of retaliation. (Def. Reply at 9-10.)

The causal connection between a plaintiff's protected activity and his employers can be shown either "(1) indirectly, by showing that the protected activity was followed closely by

discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

        For the purposes of establishing a causal connection through temporal proximity between the protected act and the retaliation, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady*, 252 F.3d 545, 554 (2d Cir. 2001). Nonetheless, "many courts in this circuit have held that periods of two months or more defeat an inference of causation." *Ragin v. E. Ramapao Cent. Sch. Dist.*, No. 05 Civ. 6496, 2010 U.S. Dist. LEXIS 32576, at *73-74 (S.D.N.Y. Mar. 31, 2010); *see also Harrison v. North Shore Univ. Hosp.*, No. CV 04-2033, 2008 U.S. Dist. LEXIS 17330, at *33 (E.D.N.Y. March 6, 2008) (noting that "a gap of up to one to two months between the protected activity and the adverse action may establish the requisite causal connection," while "[l]onger gaps . . . have been found to be too attenuated to establish a causal connection"); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552,

562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."). These cases involved situations where the employee remained at the same job with the same supervisors during the time between the protected activity and the alleged adverse employment action, thus making the passage of time more probative of a lack of causal connection. In contrast, the alleged retaliation here was years later because it came in the form of a negative reference after plaintiff had left FAMS.

At the motion to dismiss stage, some courts have declined to dismiss retaliation claims merely because the plaintiff does not allege direct evidence of a causal connection and the period between plaintiff's alleged protected activity and defendant's adverse action is more than three months long. This is particularly true where plaintiffs have alleged additional facts that suggest a plausible scenario of a causal connection or explain why the time lapse is so lengthy. *See, e.g., Batyreva v. New York City Dept. of Educ.*, No. 07 Civ. 4544, 2008 WL 4344583, at *14 (S.D.N.Y. Aug. 12, 2008) (Report and Recommendation) (declining to dismiss retaliation claim where more than two years elapsed between protected activity and adverse action because plaintiff alleged the complexity of the various procedural requirements that defendant had to comply

with in order to fire her), *adopted by* 2008 U.S. Dist. LEXIS 70834 (Sept. 18, 2008).  In declining to dismiss retaliation claims merely on the basis of a lengthy time lapse, courts have reasoned that, because the plaintiff is not required at the pleading stage to state a *prima facie* case, the plaintiff should have an opportunity at the discovery stage to produce evidence of causation.  *See, e.g.*, *Deshpande v. Medisys Health Network, Inc.*, 07-CV-375, 2008 U.S. Dist. LEXIS 37444, at *19-20 (E.D.N.Y. May 7, 2008) (noting that although there are "cases in which fewer than the five months alleged here has been found insufficiently close in time to establish a causal connection, those cases do not establish that such a period of time is insufficient as a matter of law," and declining to dismiss a retaliation claim where five months passed between the protected activity and the adverse employment action).

Furthermore, even if the period between a plaintiff's alleged protected activity and defendant's alleged adverse employment action is longer than a few months, a plaintiff may still establish causation through "circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct."  *Raniola*, 243 F.3d at 625; *see also Jute*, 420 F.3d at 179 ("[A]s is true of most Title VII allegations, to sustain her [retaliatory] negative job reference claim [plaintiff] is 'constrained to rely on circumstantial

evidence.'"").   Therefore, where a plaintiff's complaint does not allege sufficient facts to establish that his protected activity was closely followed by defendant's retaliatory act, a court may still find it sufficient for a plaintiff to allege that he was treated differently from others who engaged in similar conduct.  *See Quinones v. Kohler Mix Specialties, LLC*, No. 3:09-CV-1979, 2010 U.S. Dist. LEXIS 42779, at *15-16 (D. Conn. Apr. 30, 2010).

Here, as in *Quinones* and *Batyreva*, plaintiff alleges sufficient facts plausibly to infer a causal connection between his informal complaints of racial discrimination and the negative references circulated by FAMS officials, despite the three-year period between his alleged protected activity and the retaliatory adverse action.  Specifically, plaintiff's complaint alleges a causal connection through circumstantial evidence of disparate treatment by asserting that white air marshals did not receive negative references or otherwise face adverse employment actions for engaging in the same tardiness and security violations in which plaintiff was involved.  (*See* Compl. ¶ 23 ("[W]hite air marshals in the New York Field Office were regularly late for flights . . . and were involved in other breaches of FAMS policy . . . . [T]hose white air marshals did not face adverse employment actions as a result of their behavior.")); *Quinones*, 2010 U.S. Dist. LEXIS 42779, at *15-16

(finding plaintiff's allegation that "his supervisor became critical of his performance after he made the complaint, and . . . terminated him for conduct that others were not terminated for" was sufficient factual matter to "plausibly infer a causal connection" to survive a Rule 12(b)(6) motion, even though the plaintiff did not specify the timing of his protected activity and his retaliatory termination by the defendant).

Additionally, plaintiff asserts that white air marshals were given veteran's preference and non-probationary positions for their military service and had their security clearances processed in a timely manner, while plaintiff, who was a veteran, was only hired on a probationary status and plaintiff's security clearance remained pending throughout his employment at FAMS.  (Compl. ¶¶ 20-21.)  Finally, plaintiff alleges that, shortly after he informally complained of racial discrimination to his supervisors at FAMS, (1) two of his supervisors told plaintiff that he had "no future" at FAMS and that he would be fired if he did not resign (*id.* ¶¶ 31, 34); (2) he began to receive less desirable assignments (*id.* ¶ 38), and (3) he was terminated from FAMS (*id.* ¶ 39).  These allegations regarding disparate treatment and other retaliatory conduct by plaintiff's FAMS supervisors provide circumstantial evidence of a causal connection between plaintiff's protected activity and

the negative references, thus making it plausible that plaintiff's FAMS supervisors discriminated and/or retaliated against him three years later when the opportunity arose again via CBP's request for references in connection with its background investigation of plaintiff.

Accordingly, considering (1) that the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos*, 252 F.3d at 554, (2) that plaintiff ought to have an opportunity at the discovery stage to gather evidence of causation, *see Deshpande*, 2008 U.S. Dist. LEXIS 37444, at *19-20, and (3) that plaintiff has alleged disparate treatment and other circumstantial evidence to plausibly infer a causal connection between his protected activity and the alleged retaliatory acts by FAMS officials as well as a retaliatory motive, the court denies defendant's motion to dismiss plaintiff's retaliation claim involving negative references by FAMS officials.  Even considering the requirements of a *prima facie* retaliation claim, plaintiff has alleged sufficient facts to give the defendant "fair notice of [p]laintiff's employment discrimination claims and the grounds on which such claims rest," *Son*, 823 F. Supp. 2d at 241.

IV.  **Defendant's Motion to Dismiss Plaintiff's Discrimination and Retaliation Claims against CBP for Lack of Subject Matter Jurisdiction.**

Defendant argues that plaintiff's claim that CBP officials discriminated and retaliated against him by terminating him from CBP must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) because the court lacks subject matter jurisdiction to review national security clearance determinations.  (Def. Mem. at 12.)  Specifically, defendant asserts that the court lacks subject matter jurisdiction to review CBP's decision to terminate plaintiff because it was based, at least in part, on plaintiff's inability to receive a "Top Secret" security clearance.  (*Id.* at 14-15.)  Plaintiff argues in opposition that the court can assert subject matter jurisdiction over national security clearance determinations and, in the alternative, that CBP's decision to terminate him was not based on a national security determination but, rather, a finding that plaintiff was "unsuitable" for his position because he failed to clear a background investigation.  (Pl. Opp'n at 11-12.)  For the reasons set forth below, the court agrees with the plaintiff and denies defendant's motion to dismiss.

A.  **Legal Standard for Rule 12(b)(1) Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(1) allows a district court to dismiss a case for lack of subject matter jurisdiction if the court "lacks the statutory or constitutional

power to adjudicate [the case]." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (internal quotation marks omitted).  Indeed, it is well established that the plaintiff asserting subject matter jurisdiction has the burden of proving that jurisdiction exists by a preponderance of evidence when opposing a Rule 12(b)(1) motion to dismiss. *Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir. 2002).  In resolving a Rule 12(b)(1) motion to dismiss, the court "must accept as true all material factual allegations in the complaint," but will not draw from the pleadings inferences favorable to the party asserting jurisdiction.  *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998).  In deciding the question of subject matter jurisdiction, the court is also free to consider evidence outside the pleadings.  *Luckett*, 290 F.3d at 496–97.

**B.   Federal Court Subject Matter Jurisdiction Over Security Clearance Determinations**

In *Department of Navy v. Egan*, 484 U.S. 518 (1988), the Supreme Court found that the Merit Systems Protection Board was not competent to evaluate the merits of an executive agency's security determination, where the plaintiff challenged the denial of his security clearance.  The *Egan* court reasoned, "the protection of classified information must be committed to the broad discretion of the agency responsible, and this must

include broad discretion to determine who may have access to it.
Certainly, it is not reasonably possible for an outside
nonexpert body to review the substance of such a [security]
judgment." *Id.* at 529.  Although the Second Circuit has
recognized that "'unless Congress specifically has provided
otherwise, courts traditionally have been *reluctant* to intrude
upon the authority of the Executive in military and national
security affairs,'" *Arar v. Ashcroft*, 585 F.3d 559, 575 (2d Cir.
2009) (quoting *Egan*, 484 U.S. at 529-30), the Second Circuit has
yet to specifically decide whether and under what circumstances,
after *Egan*, federal courts have subject matter jurisdiction over
the revocation or denial of a security clearance in the Title
VII context.

Other circuits and district courts in this circuit,
however, have construed *Egan* to preclude any "nonexpert body,"
including federal courts, from reviewing under Title VII an
executive agency's decision to deny an individual a security
clearance.  *See, e.g.*, *Ryan v. Reno*, 168 F.3d 520, 523-24 (D.C.
Cir. 1999) ("[A]n adverse employment action based on denial or
revocation of a security clearance is not actionable under Title
VII."); *Bodkin v. West*, 91 F.3d 129 (4th Cir. 1996) (unpublished
table decision) (affirming district court's dismissal for lack
of subject matter jurisdiction of plaintiff's Title VII
challenge to security clearance suspension); *Perez v. FBI*, 71

40

F.3d 513, 514-15 & n. 6 (5th Cir. 1995) (finding no subject matter jurisdiction to review security clearance suspension under Title VII); *Brazil v. United States Dep't of Navy*, 66 F.3d 193, 196 (9th Cir. 1995) (holding that *Egan* precludes judicial review of security clearance denials under Title VII); *Shehabeldin v. United States Postal Inspection Serv.*, No. 11-CV-5215, 2011 U.S. Dist. LEXIS 135462, at *5-6 (E.D.N.Y. Nov. 23, 2011) (declining to review plaintiff's Title VII challenge to her security clearance revocation); *Criales v. American Airlines, Inc.*, Nos. 97-CV-0526, 97-CV-1460, 1999 U.S. Dist. LEXIS 20582, at *25-26 (E.D.N.Y. Dec. 28, 1999) (holding that courts lack subject matter jurisdiction to review constitutional challenges to security clearance denials); *Williams v. Reilly*, 743 F. Supp. 168, 171 (S.D.N.Y. 1990) ("*Egan* makes clear that this Court has neither the authority nor the expertise to review this [security clearance] decision.").

    In contrast, at least one court outside this Circuit has found that if a plaintiff's employment termination was due to an adverse suitability determination made after a background investigation, as distinct from a security clearance denial, federal courts may exercise subject matter jurisdiction over the plaintiff's Title VII employment discrimination claims.  In *Jones v. Ashcroft*, 321 F. Supp. 2d 1 (D.D.C. 2004), the court found that it had subject matter jurisdiction to review a

plaintiff's Title VII claim challenging the Federal Bureau of Investigation's ("FBI's") rescission of his employment offer after the FBI determined from a background investigation that the plaintiff was unsuitable for the position. *Id.* at 8. The *Jones* court concluded that the suitability determination was not "made in the interest of national security" because there was "no evidence before th[e] Court to indicate that the government, at any time prior to the commencement of this lawsuit, considered national security as a basis for its decision not to hire the plaintiff." *Id.* In other words, the *Jones* court found that it had subject matter jurisdiction to review the adverse suitability determination where there was no affirmative evidence in the record that the defendant considered national security in making such a determination.

In *Bennett v. Chertoff*, 425 F.3d 999 (D.C. Cir. 2005), however, the District of Columbia Circuit found that judicial review of a background investigation was barred because there was evidence in the record that the plaintiff's inability to clear her background investigation was equivalent to her inability to obtain a security clearance for her position at the Transportation Security Administration ("TSA"); namely, there was a sworn statement from a TSA official that plaintiff's termination was "due to her inability to sustain a security clearance." *Id.* at 1003 (internal quotation marks omitted).

Likewise, in *Ciralsky v. C.I.A.*, 689 F. Supp. 2d 141 (D.D.C. 2010), the plaintiff alleged that his termination "was predicated on security considerations" that he posed a "special security risk."  *Id.* at 150.  The court thus found that the CIA's decision to revoke plaintiff's security clearance and his termination "cannot be viewed as unrelated events," and concluded that it lacked subject matter jurisdiction over a Title VII claim involving plaintiff's termination because it inextricably implicated the merits of the security clearance revocation.  *Id.* at 150-51.

**C.   Whether Plaintiff's Termination by CBP Was Based on a National Security Determination**

Here, there is no evidence in the record that the CBP considered national security or plaintiff's ability to obtain a security clearance as a basis for plaintiff's termination. According to plaintiff's declaration submitted in support of his complaint of discrimination to the EEOC, the letters he received informing him of his tentative selection with the CBP on March 26, 2007, updating him on the status of his tentative selection on May 9, 2007, and congratulating him on his "selection and acceptance" of a position with the CBP on May 24, 2007, did not mention any requirement that plaintiff must obtain a national security clearance.  (*See* EEOC Decl. at 2-3.)  In fact, the May 9, 2007 letter updating plaintiff on the status of his tentative

43

selection with the CBP stated "Your duty location will NOT be known until you have completed all the pre-employment requirements, including the background investigation." (*Id.* at 2.)

Furthermore, the October 4, 2007 NOPA only informed plaintiff that he was being found "unsuitable for employment . . . based on potentially derogatory information developed during [his] background investigation," including his failure to disclose his termination from two previous employers and his resignation from another previous employer, his tardiness and the security violation at the FAMS, and his unexcused absences during military service. (NOPA at 1-2.) Although the NOPA stated that the information from plaintiff's background investigation "may be furnished" to government officers "for employment purposes, to include a security clearance determination, [and] an evaluation of qualifications, suitability, and loyalty to the U.S. government" (*id.* at 2-3), there is no indication in the NOPA that the CBP ever proceeded to make a security clearance determination after making the adverse background determination. Similarly, plaintiff's December 17, 2007 termination letter from Mitchell merely stated that plaintiff "failed to meet the standards required to clear [his] background investigation," and did not mention any

concerns regarding national security.  (Mitchell Termination
Letter.)

Defendant points to plaintiff's allegation in the
Third Amended Complaint that the background investigation was
"conducted to determine [his] eligibility for a 'Top Secret'
security clearance" as evidence that plaintiff's termination was
based on a national security determination.  (Def. Reply at 6
(citing Compl. ¶ 45).)  While that may be the case, plaintiff's
allegation is consistent with his argument that a background
check is distinct from a security clearance determination.
Indeed, plaintiff's complaint alludes to this distinction when
he alleges that Mitchell told him that "she would have no
problem with Corbett's continued employment with CBP if he had
passed his background check."  (Compl. ¶ 52.)  Additionally,
defendant cites plaintiff's allegation that CBP officials
"recommended that [he] be denied a security clearance" as proof
that he was terminated because of his inability to obtain a
security clearance.  (Def. Reply at 6 (citing Compl. ¶ 49).)
Regardless of that recommendation, however, plaintiff's
complaint clearly alleges that his termination was due to the
fact that he "failed his background check" (Compl. ¶ 51), and
not due to the recommendation that he be denied a security
clearance.  In any event, plaintiff's own allegations would not
control the court's determination of subject matter jurisdiction,

and the plaintiff should at least be able to take discovery on this issue.

Finally, defendant incorrectly relies on *Bennett*. In *Bennett*, the record contained a sworn statement from a TSA official stating that plaintiff's termination was "due to her inability to sustain a security clearance." 425 F.3d at 1003 (internal quotation marks omitted). In contrast, here, as in *Jones*, "there is nothing in the record before this Court to indicate that [defendant's] suitability determination was made with any 'predictive judgment' about whether hiring plaintiff would implicate national security concerns." 321 F. Supp. 2d at 8. Accordingly, at this juncture of the case on a motion to dismiss[8], the court denies defendant's motion to dismiss and finds that there is subject matter jurisdiction over plaintiff's claims regarding his termination from CBP because there is no evidence in the record that CBP terminated plaintiff on the basis of a national security determination.[9]

## V.   Plaintiff's Motion to Amend His Complaint

In the proposed Fourth Amended Complaint, plaintiff seeks to add defendants Felix Jimenez and Ira Shinske of FAMS

---

[8] The court notes, however, that the issue of subject matter jurisdiction is not waivable and can be raised by the parties or the court *sua sponte* at any stage of the case.  *See* Fed. R. Civ. P. 12(h)(3).

[9] Given this disposition based on the lack of any evidence that CBP's adverse suitability determination was related to national security concerns, the court need not decide the issue of whether *Egan* precludes federal judicial review of executive security clearance denials in the Title VII context.

and Susan Mitchell of CBP in their individual capacities,
alleging that they intentionally violated plaintiff's Fifth
Amendment rights by discriminating against him on the basis of
his race in the terms and conditions of his employment and by
retaliating against him for protected complaints of
discrimination.  (*See* ECF No. 59-1, Proposed Fourth Amended
Complaint ("Proposed 4th Compl.").)  Defendant argues in
opposition that the motion to amend should be denied because (1)
Title VII provides the exclusive remedy for employment
discrimination claims, and thus the proposed amendment to add
discrimination claims pursuant to *Bivens* is futile, and (2)
plaintiff's *Bivens* claims are time-barred.  (Def. Mem. at 21-
22.)  These arguments will be addressed in turn.

> **A.   Legal Standard for a Motion to Amend the Complaint**

Under the Federal Rules of Civil Procedure, a court
should "freely give leave [to amend the pleadings] when justice
so requires."  Fed. R. Civ. P. 15(a)(2).  The rationale
underlying this rule is that "[i]f the underlying facts or
circumstances relied upon by a plaintiff may be a proper subject
of relief, [the plaintiff] ought to be afforded an opportunity
to test his claim on the merits" through an amended pleading.
*Foman v. Davis,* 371 U.S. 178, 182 (1962).  Conversely, however,
"motions to amend should generally be denied in instances of
futility, undue delay, bad faith or dilatory motive, repeated

failure to cure deficiencies by amendments previously allowed, or undue prejudice to the nonmoving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (citing *Foman,* 371 U.S. at 182).  Therefore, "it is well established that leave to amend a complaint need not be granted where amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).  A proposed amendment is futile where it "fails to state a claim" or "where the claim or defense proposed to be added has no colorable merit." *Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 250 (S.D.N.Y. 2009) (internal quotation marks omitted).

**B.   Whether Plaintiff's *Bivens* Claims for Employment Discrimination are Futile**

In *Brown v. General Servs. Admin.*, 425 U.S. 820 (1976), the Supreme Court held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Id.* at 835; *see Rivera v. Heyman*, 157 F.3d 101, 105 (2d Cir. 1998) (recognizing *Brown*'s holding "that Title VII provides the sole remedy for federal employees alleging employment discrimination"); *Annis v. County of Westchester*, 36 F.3d 251, 255 n.4 (2d Cir. 1994) (same).

A narrow exception to the *Brown* rule, however, is applicable where the individual plaintiff does not fall into one of Title VII's protected classes.  *See*, e.g., *Davis v. Passman*,

442 U.S. 228, 247 (1979) (holding that a congressional employee could bring an employment discrimination suit under *Bivens* because, *inter alia*, Title VII did not protect congressional employees who were not in the competitive service); *cf. Webster v. Doe*, 486 U.S. 592, 601-05 (1988) (permitting plaintiff to bring a constitutional claim challenging his termination from the CIA on the basis of national security concerns where there was evidence that such termination was based on plaintiff's sexual orientation and Title VII did not offer a remedy for sexual orientation discrimination).

In contrast, some courts have found that individuals who fall under one of Title VII's protected classes may not bring similar claims under *Bivens* even if, pursuant to *Egan*, the court lacks subject matter jurisdiction to review those Title VII claims because they involve a security clearance determination. *See, e.g.*, *Brazil*, 66 F.3d at 197-98. Although the Second Circuit has not decided a case where a plaintiff brought *Bivens* claims for race discrimination because his Title VII remedies were unavailable due to the court's inability to review security clearance denials after *Egan*, other circuit courts in such circumstances have consistently found that the *Bivens* constitutional claims are precluded by *Brown*. *See Brazil*, 66 F.3d at 196-98 (finding that (1) the court lacked subject matter jurisdiction to review plaintiff's Title VII challenge to

the revocation of his security clearance and (2) the plaintiff
could not challenge his security clearance revocation on
constitutional grounds because Title VII was the exclusive cause
of action for plaintiff's employment discrimination claims);
*Perez v. F.B.I.*, 71 F.3d 513, 514-15 & n.6 (5th Cir. 1995)
(finding that the court lacked subject matter jurisdiction over
both Title VII and *Bivens* claims alleging retaliation by
revocation of a top secret security clearance).

        In *Brazil*, the court stated that "[s]o long as
Congress' failure to provide money damages, or other significant
relief, has not been inadvertent, courts should defer to its
judgment, because Congress is the body charged with making the
inevitable compromises required in the design of a massive and
complex . . . program [to provide adequate remedial mechanisms
for constitutional violations]."  66 F.3d at 198 (quoting
*Kotarski v. Cooper*, 866 F.2d 311, 312 (9th Cir. 1989)) (internal
quotation marks omitted).  Therefore, the *Brazil* court reasoned,
because Congress provided "the 'massive and complex program' of
Title VII [as a means for relief] in all areas of discrimination
*except* for that relatively narrow area dealing with security
clearance decisions," it could not be said that Congress's
failure to provide relief for security clearance denials was
"inadvertent."  *Id*.  Accordingly, based on this case law, a
*Bivens* claim challenging a security clearance denial on the

basis of race or retaliation discrimination does not appear to fall within the narrow exception to the *Brown* rule as recognized by *Davis.*

Here, plaintiff seeks to analogize his *Bivens* claims to the constitutional claims in *Davis*, arguing that if his discrimination claims are unreviewable under Title VII for lack of subject matter jurisdiction, he should be allowed to bring *Bivens*-style constitutional claims based on race discrimination and retaliation against Mitchell, Jiminez, and Shinske.  (Pl. Opp'n at 21-22.)  Because the court has found that, at this juncture of the case, it has subject matter jurisdiction over plaintiff's Title VII claims involving his termination from CBP, Title VII does provide a remedy and plaintiff need not and cannot resort to a *Bivens* claim for his alleged discrimination. *See Brown,* 425 U.S. at 835.  Accordingly, the court denies plaintiff's motion to amend as futile because he has a remedy under Title VII, and the court need not reach the more complex issue of whether, if this court did not have subject matter jurisdiction over the Title VII claims, plaintiff is barred from bringing his *Bivens* claims on the ground that Title VII provides the exclusive cause of action and remedy for his claims. Additionally, because the court denies plaintiff's motion to amend as futile, the court need not reach the issue of whether plaintiff's proposed *Bivens* claims are time-barred.

**<u>CONCLUSION</u>**

For the foregoing reasons, the court denies (1) defendant's motion for summary judgment on plaintiff's failure to exhaust his retaliation claim involving FAMS, (2) defendant's motions to dismiss for failure to state a claim and for lack of subject matter jurisdiction, and (3) plaintiff's motion to amend the Third Amended Complaint.  The parties shall confer and jointly file a status letter in two weeks, or by October 8, 2012, advising the court on how they wish to proceed in this case, and whether a settlement conference before Magistrate Judge Bloom would be beneficial.

**SO ORDERED.**

Dated:     Brooklyn, New York
           September 24, 2012

                                    _____/s/_____
                                    KIYO A. MATSUMOTO
                                    United States District Judge